# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

KIMBERLY D. SMITH,        )
                                )
        Plaintiff,        )
                                )
v.                          )     No.:  3:14-CV-249-TAV-CCS
                                )
FIRST TENNESSEE BANK    )
NATIONAL ASSOCIATION,    )
                                )
        Defendant.      )

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on defendant First Tennessee Bank National Association's Motion for Summary Judgment [Doc. 28]. Plaintiff Kimberly D. Smith filed a response in opposition [Doc. 41] along with responses and objections to defendant's statement of undisputed material facts [Doc. 40 (sealed) (hereinafter "plaintiff's objections")],[1] to which defendant replied [Doc. 42]. Plaintiff then filed a supplemental response [Doc. 48], and defendant replied [Doc. 49]. The Court has carefully considered the matter and, for the reasons stated herein, will grant in part and deny in part defendant's motion as to plaintiff's claims.[2]

---

[1] Defendant filed a motion to strike and disregard or, in the alternative, to seal plaintiff's responses and objections to defendant's statement of undisputed material facts [Doc. 43]. Plaintiff responded in opposition [Doc. 44], and defendant replied [Doc. 46]. The Court found plaintiff had good cause for submitting her responses and objections, but granted defendant's motion to seal plaintiff's filing [Doc. 47].

[2] Defendant requested oral argument on its motion for summary judgment [Doc. 45 p. 1]. The Court considers requests for oral argument on a case-by-case basis, and upon review of the record, the Court finds that oral argument is not needed.

## I.    Background

Plaintiff, Kimberly D. Smith, worked for defendant, First Tennessee Bank National Association, from May 2012 until June 2013, although the exact date of her termination is in dispute [Doc. 40 pp. 1, 36–37].[3]  Plaintiff's brother-in-law is blind, severely autistic, and diabetic, and he lives with plaintiff and her husband [*Id.* at 7]. Plaintiff alleges that First Tennessee Bank terminated her due to her association with her disabled brother-in-law, while defendant claims it fired plaintiff because of her poor work performance.

Plaintiff was hired by Karen Stuck, the Senior Vice-President and Regional Sales Manager, to be a Financial Services Representative ("FSR") at both the South Grove and the South Knoxville branches of First Tennessee Bank [*Id.* at 1–2].  Plaintiff was a full-time employee and worked at both branches throughout the week [*Id.* at 2].  Sandra Couch managed both the South Grove and South Knoxville branches, and operated as plaintiff's direct supervisor and manager [*Id.*].  Ms. Couch reported directly to Ms. Stuck [*Id.*].

As a FSR, plaintiff's job was customer-service focused, and her duties included opening and closing accounts, answering the phone, greeting customers, and making wealth-management appointments for customers [*Id.* at 4].  FSRs had monthly sales

---

[3] Plaintiff has disputed many facts from defendant's statement of undisputed material facts [Doc. 32].  The Court will primarily cite to plaintiff's objections, as it incorporates both defendant's facts and plaintiff's responses to those facts [Doc. 40].  Document 40 is sealed because it contains confidential information regarding defendant's customers [*See* Doc. 47]. Accordingly, the Court will generalize some of the facts that are pertinent to this motion.

2

goals, weekly goals for outbound calls to current customers, and monthly goals for how many customers they referred to defendant's wealth-management group [*Id.* at 6]. Plaintiff asserts, however, that her overall job performance was evaluated on an annual basis [*Id.*]. Plaintiff admits that she did not meet all of her monthly goals but maintains that she received a 100% overall rating in her 2012 performance review [*Id.* at 6–7]. Plaintiff also admits that one of her co-workers would regularly point out errors in plaintiff's work product in order to help improve her own work performance [*Id.* at 14]. Plaintiff "often seemed upset" when her co-worker did so [*Id.*].

Defendant's practice is that "every customer should be greeted by all available employees" when a customer enters the bank [*Id.* at 17]. As Ms. Couch described, "[w]e stand up and greet our customers, it's not an option" [*Id.* at 5]. Plaintiff acknowledges that greeting customers is "important to any Bank open to the public" [*Id.* at 4]. Despite this, plaintiff argues it would have been "impossible" for her "to meet the honest and objectively neutral requirements of her job if she had to 'stand and greet' every customer" [*Id.*]. As a result, plaintiff admits that when a customer would come in her direction, or when the other FSRs were busy, she would "[j]ust look up and say hello" to the customer [*Id.* at 5–6].

Defendant maintains that plaintiff's failure to stand and greet customers was an "ongoing" issue, but plaintiff disputes this contention [*Id.* at 17]. To correct the issue, Ms. Couch had plaintiff's computer physically moved on her desk in both branches so as to enable plaintiff to better see customers as they walked in the door [*Id.* at 17–18].

3

Plaintiff does not deny this [*Id.* at 18]. She stated in her deposition that "[s]ometimes I may have been looking down and not greeted every customer that walked through the door. . . . I probably could have improved on that some" [*Id.* at 20]. Plaintiff does dispute, however, defendant's assertion that her coworkers observed her regularly failing to greet customers, including one incident when a co-worker allegedly counted twenty-one customers who plaintiff failed to greet in a four-hour time period [*Id.* at 17–18]. In response, plaintiff also submitted evidence from a co-worker who noted that plaintiff's desk was further from the bank entrance than that of the other FSR on duty, so she would have to "put forth an effort" to be able to see everyone coming into the bank [Doc. 48 p. 2].

All of the FSRs needed to coordinate their lunch schedules so as to ensure that at least one FSR remained at the branch at all times [Doc. 40 p. 4]. Plaintiff needed to leave the bank's premises each day during lunch in order to take care of her disabled brother-in-law [*Id.* at 7–8]. While defendant claims that other employees would adjust their lunch schedules in order to accommodate plaintiff's need to leave during lunch, plaintiff maintains that she gave her co-workers their choice as to when they would take lunch [*Id.* at 8]. Defendant claims that plaintiff was "often" gone on her lunch break for longer than the one hour she was allotted, but plaintiff disputes this assertion, noting that she did not take longer than an hour "very often, if ever" [*Id.* at 8–9].

Defendant also maintains that plaintiff received several customer and co-worker complaints, which plaintiff denies [*Id.* at 20–23, 27–29]. Plaintiff asserts that she was

4

counseled only once during her tenure working for defendant, in which she was told about a customer complaint regarding a loan application [*Id.* at 21]. Plaintiff acknowledged in her deposition that if an employee had several customer complaints, "that could be considered unacceptable work performance" [*Id.* at 20]. Beyond the one customer complaint to which plaintiff admits, plaintiff also acknowledges that she once incorrectly advised a customer regarding an "ACH" stop payment, which resulted in her co-worker needing to fix the mistake so as to prevent the customer from incurring a fee [*Id.* at 22, 24–25]. She also admits that Ms. Couch and Ms. Stuck informed her of a complaint they received from a supervisor who works at First Link, defendant's internal call center, who noted that plaintiff had used unprofessional language and was disrespectful [Docs. 40 p. 27; 40-2 p. 101].

Defendant maintains that plaintiff would occasionally tell her co-workers that she was bored at work, would spend time at work browsing the internet, and would use her work phone for personal matters, including one time for up to two hours [Doc. 40 at 25–26]. Plaintiff denies these allegations [*Id.*]. Defendant also states that it received several complaints regarding plaintiff's attire at work, and plaintiff admits that she was counseled once regarding this issue [*Id.* at 28–29]. Ms. Couch provided plaintiff with "hand-me-down" clothing, which defendant states was in an effort to help plaintiff dress appropriately for work [*Id.* at 29].

On February 7, 2013, plaintiff was counseled by Ms. Couch and Ms. Stuck regarding her performance at work [*Id.* at 30]. Prior to this meeting, Ms. Stuck conferred

5

with the human resources department regarding the warning she was going to give plaintiff [*Id.*]. In this documented verbal warning, Ms. Couch and Ms. Stuck told plaintiff there were performance issues regarding her "quality of work, quantity of work, on-the-job conduct, attendance and punctuality, unprofessional conduct, judgment/decision-making, negligence/carelessness," and her attire at work [*Id.*]. Ms. Couch and Ms. Stuck then had plaintiff sign a written recitation of that warning, which plaintiff claims she did not read [*Id.* at 31].

Defendant also submits that plaintiff was again counseled regarding her performance issues in May 2013, which plaintiff denies [*Id.* at 33]. In this meeting, Ms. Couch and Ms. Stuck allege that they spoke to plaintiff regarding her "poor customer service, her lack of professionalism, and her failure to do the basics of her job," among other things [*Id.*]. In June 2013, prior to the date on which plaintiff was terminated, Ms. Stuck again met with Ms. Couch and Kristi McCarter, the lead teller at the South Grove branch, where Ms. McCarter informed Ms. Stuck about an alleged "plethora of continued issues" with respect to plaintiff [*Id.* at 35]. Plaintiff disputes this, alleging that Ms. Stuck received a "plethora" of alleged complaints only on the morning plaintiff was terminated [*Id.*]. Ms. Stuck then sought input from other employees at the bank—who all allegedly told her of similar performance issues with respect to plaintiff—and consulted with the human resources department regarding whether plaintiff should be terminated [*Id.*]. Plaintiff disagrees with this alleged timeline, asserting that Ms. Stuck had "no designs" to

terminate plaintiff on the morning of her termination, and instead only met with other employees regarding plaintiff's performance that very day [*Id.*].

Ultimately, because of her "multitude of continued and ongoing performance issues," including allegedly over fifteen customer complaints, defendant decided to terminate plaintiff in June 2013 [*Id.* at 34, 37]. Defendant maintains that plaintiff was terminated on June 21, 2013, while plaintiff asserts she was terminated on June 19, 2013 [*Id.* at 36–37]. In terminating her, plaintiff states that defendant did not follow its "progressive discipline policy" when it failed to counsel her for a second time, despite defendant's allegation that it counseled her in both February and May 2013 [*Id.* at 34].

Plaintiff maintains that both Ms. Stuck and Ms. Couch—plaintiff's superiors and the primary individuals involved in defendant's decision to terminate plaintiff—were aware of her brother-in-law's disabilities before she was terminated [Doc. 40 pp. 10–11]. Plaintiff submits that the fact that she told Ms. Stuck in her initial job interview that she had to care for her brother-in-law at lunch and Ms. Stuck's handwritten notes from the date plaintiff was terminated indicate that Ms. Stuck was aware of plaintiff's brother-in-law's disabilities [*Id.*]. In these handwritten notes from the date of plaintiff's termination, Ms. Stuck wrote that plaintiff was "given special consideration for lunchbreaks due to taking care of indigent relative. Refuses to reciprocate flexibility" [*Id.* at 11]. Defendant denies that Ms. Stuck had any knowledge of plaintiff's brother-in-law's disabilities until after the instant lawsuit was filed [*Id.* at 10].

Defendant also asserts that Ms. Couch was only became aware that plaintiff's brother-in-law was diabetic when the instant suit was commenced, and that she was never aware of his other disabilities [*Id.* at 10, 41]. Plaintiff disputes this assertion, claiming that she had discussed "the full panoply" of her brother-in-law's disabilities with Ms. Couch on "numerous occasions," and that Ms. Couch had previously derogatorily referred to her brother-in-law to a customer [*Id.*]. Plaintiff claims that, in this purported incident, Ms. Couch commented to a customer that plaintiff could not assist him because "she's probably taking care of her retarded brother—or brother-in-law, whatever" [*Id.* at 11, 15]. Ms. Couch denies making this statement, as her husband is disabled, she has three autistic nephews, and she finds the statement to be "unacceptable" [*Id.* at 15–16]. Nevertheless, plaintiff maintains that Ms. Couch "had a problem" with her using her lunch break to care for her brother-in-law, but admits that Ms. Couch never told her she could not leave for lunch, always allowed her to take lunch when she desired, and never complained to plaintiff regarding her lunch schedule [*Id.* at 11–13]. Plaintiff also does not dispute that plaintiff's co-workers never heard Ms. Couch, or any other bank employee, refer to plaintiff's brother-in-law or her need to care for him in a derogatory or negative manner [*Id.* at 17].

After her termination, plaintiff applied for unemployment benefits, which she claims were initially denied [*Id.* at 38]. She alleges that, in a telephone call regarding her benefits, an officer for the Tennessee Department of Labor read a statement from Ms. Couch that stated plaintiff was terminated because she made it "difficult to take lunch due

8

to having to go home to take care of [her] blind, autistic and insulin-dependent brother-in-law" [*Id.*].   Defendant denies that Ms. Couch ever made this statement [*Id.* at 41]. Plaintiff admits she has never actually seen this statement that was purportedly read to her [*Id.*].   Plaintiff's unemployment benefits were eventually granted, and she received them until December 16, 2013 [*Id.* at 39, 42].   Plaintiff later started working for Vanderbilt Mortgage & Finance Company, where she continues to hold a full-time position [*Id.* at 42].   Plaintiff filed the instant suit against defendant on June 9, 2014, asserting that defendant discharged her because of her brother-in-law's disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("ADA") [Doc. 1 ¶¶ 20–28].   As a result of defendant's discriminatory conduct, plaintiff also has a claim against defendant for negligent infliction of emotional distress [*Id.* at 29–33] [Doc. 1].

## II.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party bears the burden of establishing that no genuine issues of material fact exist.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).   All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.

9

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). The plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[M]ere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (quotations and citation omitted). Summary judgment may not be defeated "based on rumors, conclusory allegations, or subjective beliefs." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson*, 477 U.S. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Hein*, 232 F.3d at 488.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C.*

10

*Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III.  Analysis

Defendant filed a motion for summary judgment against plaintiff's claims, in which it argues that plaintiff cannot make out a *prima facie* case of association discrimination because she cannot prove that she was known to be associated with a disabled individual[4] or that she was terminated under circumstances that raise a reasonable inference that her brother-in-law's disability was a determining factor in the termination decision [Doc. 28 p. 2]. Even if plaintiff is able to establish a *prima facie* case, defendant maintains that it can demonstrate a legitimate, non-discriminatory reason for its decision to terminate plaintiff—her poor job performance—and that plaintiff cannot prove that this was merely a pretext for association discrimination [*Id.*]. Finally, defendant submits that plaintiff cannot make out a *prima facie* case of negligent infliction of emotional distress [*Id.* at 3].

In response, plaintiff asserts that she has direct evidence of defendant's discrimination [Doc. 41 p. 7]. In the alternative, she also maintains that is able to establish a *prima facie* case of discrimination, and that defendant's legitimate, non-

---

[4] For purposes of this memorandum, the Court assumes that plaintiff's brother-in-law is a qualified individual with a disability, as defined by the ADA.

discriminatory reason for terminating her is merely a pretext for its discrimination [*Id.* at 8–9]. Finally, plaintiff concedes that she cannot establish a *prima facie* case of negligent infliction of emotional distress [*Id.* at 1 n.1].

### A. Disability Discrimination

The ADA prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4) (2009). Familial relationships are "associations" protected by the ADA. *Booker v. Delfasco, LLC*, No. 2:13-CV-341, 2015 WL 999085, at *6 (E.D. Tenn. March 6, 2015).

Plaintiff's claim of association discrimination arises under this "infrequently litigated section" of the ADA, which the Sixth Circuit first addressed in a published opinion in *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011). In that opinion, the Sixth Circuit adopted the Seventh Circuit's outline of three theories of ADA association discrimination: (1) expense theory; (2) disability by association theory; and (3) distraction theory. *Id.* (citing *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004)). In the expense theory, an employee claims the employer discharged her because of the cost of insuring the associated disabled person under the employer's health plan. *Williams v. Union Underwear Co.*, 614 F. App'x 249, 254 (6th Cir. 2015) (citing *Stansberry*, 651 F.3d at 487). Under the disability by association theory, the employer discriminates against the employee because the employer fears the employee

may contract the disability from the associated person or the employee is genetically predisposed to develop the disability. *Id.* Finally, in the distraction theory, the employer discriminates against the employee because the employee has been "somewhat inattentive at work" because of the associated person's disability. *Id.* Plaintiff relies on the distraction theory of ADA association discrimination in her claim, asserting that she was terminated from her position as a FSR because her employer believed her to be inattentive at work due to her brother-in-law's disability [Doc. 41 p. 7].

In ADA cases, "a plaintiff may establish unlawful discrimination by introducing direct evidence of discrimination . . . or by introducing indirect evidence of discrimination to shift the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for making the adverse employment decision." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996) (citations omitted), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc). "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997). Thus, the Court must determine whether plaintiff's alleged evidence of association discrimination can be construed as direct evidence, which would entitle plaintiff to proceed to a jury trial, or circumstantial evidence, which would then invoke the *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Booker*, 2015 WL

999085 at *6 (invoking this method of analysis in an ADA association discrimination case).

### 1. Direct Evidence

Plaintiff purports to have direct evidence that supports her distraction theory of ADA association discrimination [Doc. 41 pp. 7–8]. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted). The Sixth Circuit has described direct evidence as that which "*requires* the conclusion that unlawful [discrimination] was a motivating factor in the employer's action." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2007) (emphasis in original). Yet "the issue of what constitutes direct evidence is one 'that has baffled the courts for some time.'" *Booker*, 2015 WL 999085 at *7–*8 (quoting *Wright v. Southland*, 187 F.3d 1287, 1288 (11th Cir. 1999)) (choosing not to "continue grappling with an elusive standard," as the result would have been the same if the evidence were analyzed as being direct or indirect). *See also Speen v. Crown Clothing Corp.*, 102 F.3d 625, 636 (1st Cir. 1996) (describing the line that separates direct and indirect evidence of discriminatory motive as being "blurred rather than clearly drawn").

Plaintiff points to four pieces of evidence that she claims are direct evidence that plaintiff was terminated due to her association with her disabled brother-in-law. She first asserts that Ms. Stuck's handwritten notes from the day plaintiff was terminated describe that plaintiff required "special consideration for lunchbreaks due to taking care of

14

indigent relative" and that she "refuses to reciprocate flexibility," indicating she was terminated due to her association with her brother-in-law [Doc. 41 p. 7]. Second, the declarations of her former co-workers demonstrate that she "had become a pariah" in the workplace, also purportedly tending to show the consequences of her association with her brother-in-law [*Id.* at 7–8]. Third, plaintiff states that she did not violate any neutral attendance or tardiness policy. Finally, plaintiff asserts that she met defendant's legitimate and objective performance expectations, all allegedly demonstrating that there were no other legitimate reasons for terminating her [*Id.* at 8].

Contrary to plaintiff's assertions, however, the Court finds that these facts, even when viewed in the light most favorable to plaintiff, do not establish direct evidence that she was terminated from her job because of her association with her disabled brother-in-law. First, Ms. Stuck's notes reference an "indigent" relative, but do not reference a disabled relative.[5] Second, plaintiff's co-workers were not primarily responsible for the decision of whether to terminate her, and thus their feelings toward plaintiff do not establish conclusively that she was terminated because of her association with her brother-in-law. Finally, even if plaintiff did not violate any attendance policy and met all performance expectations, this does not establish conclusively, without the need for inferences, that she was terminated because of her association with her disabled brother-

---

[5] "Disability," as defined in the ADA, refers to "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102. "Indigent," as defined in the Merriam-Webster dictionary, means "lacking money" or "very poor." *Indigent*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/indigent (last visited Dec. 1, 2015).

in-law.  Plaintiff has not set out direct evidence of discrimination, and, accordingly, the Court must now determine whether plaintiff can demonstrate indirect evidence of discrimination.

## 2.    Indirect Evidence

In the absence of direct evidence of discrimination, courts analyze ADA discrimination claims following the burden shifting approach of *McDonnell Douglas,* 411 U.S. 792.  Under the *McDonnell Douglas* burden-shifting framework, plaintiff must first set out a *prima facie* case of discrimination.  *Williams*, 614 F. App'x at 253; *Stansberry*, 651 F. 3d at 487.  This burden "is not onerous."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Indeed, it is "easily met."  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).

After plaintiff establishes a *prima* facie case of discrimination, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employment action.  *McDonnell Douglas*, 411 U.S. at 802–04; *Williams*, 614 F. App'x at 253–54 (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.2d 1099, 1105 (6th Cir. 2008)).  If defendant does so, then the burden returns to plaintiff to prove that the stated reason is a pretext for association disability discrimination.  *Id.*  The Court's role at summary judgment is to "determine whether there is 'sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'"  *Rachells v. Cingular*

16

*Wireless Emp. Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

### a. *Prima Facie* Case

In *Stansberry*, the Sixth Circuit adopted the Tenth Circuit's formulation of how plaintiffs can establish a *prima facie* case of association discrimination. *Stansberry*, 651 F.3d at 487 (citing *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997)). Plaintiff must establish that: (1) she was qualified for the position; (2) she was subject to an adverse employment action; (3) she was known to be associated with a disabled individual; and (4) the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of her relative was a determining factor in the decision. *Id.*

Defendant concedes that plaintiff can demonstrate the first two requirements of this *prima facie* standard, but alleges that plaintiff cannot establish prongs three or four. As for the third prong, that plaintiff was known to be associated with a disabled individual, defendant submits that Ms. Stuck had no knowledge of plaintiff's brother-in-law's disability prior to terminating her [Doc. 32 p. 24]. It maintains plaintiff cannot point to any evidence that Ms. Stuck was aware of plaintiff's brother-in-law's condition, beyond plaintiff's own mere speculation that Ms. Couch told Ms. Stuck about it [Doc. 40-2 pp. 120–21]. Defendant directs the Court to plaintiff's deposition, wherein, when asked if she has any "actual knowledge" that Ms. Couch told Ms. Stuck about plaintiff's brother-in-law's disabilities, plaintiff responded: "No" [*Id.*].

17

Plaintiff responds that Ms. Couch admits she knew plaintiff's brother-in-law had disabilities and that she was involved in the termination decision, thus establishing defendant's knowledge of her association with a disabled individual [Doc. 41 pp. 8–9]. Plaintiff also asserts that Ms. Couch commented to a customer that plaintiff was "probably taking care of her retarded brother—or brother-in-law—whatever," also demonstrating knowledge [Doc. 40 p. 11]. Plaintiff submits that Ms. Stuck's reference to plaintiff's "indigent relative" in her notes from the day plaintiff was terminated is also sufficient to establish knowledge [*Id.*]. Finally, plaintiff alleges—relying on her own deposition—that she told Ms. Stuck in her initial job interview that she had to go home at lunch to take care of her brother-in-law, although plaintiff does not allege that she is certain she told Ms. Stuck about her brother-in-law's disability at that time [Doc. 40 p. 10].

Upon review of the parties' filings and the record, while viewing the facts in the light most favorable to plaintiff, the Court finds that plaintiff has presented sufficient evidence to establish that defendant had knowledge of plaintiff's brother-in-law's disability prior to her termination. By defendant's own admission, Ms. Couch knew that plaintiff's brother-in-law was diabetic prior to her termination [Doc. 32 p. 6]. Even assuming Ms. Couch did not know plaintiff's brother-in-law was blind or autistic, diabetes fits within the ADA's definition of "disability." 42 U.S.C. § 12102. Additionally, plaintiff has submitted evidence that Ms. Couch commented to a customer that plaintiff was "probably taking care of her retarded brother—or brother-in-law,

whatever" [Doc. 40 p. 11].  According to defendant's submissions, Ms. Couch was also involved in plaintiff's performance counseling on February 7, 2013, and in May 2013, and she was later involved in both the decision to terminate plaintiff and in the termination itself [Doc. 32 pp. 16–18].  Throughout this process, Ms. Stuck sought input from Ms. Couch and "other employees" as to plaintiff's performance in the workplace. Viewing this evidence in the light most favorable to plaintiff, it is possible that Ms. Couch told Ms. Stuck about plaintiff's brother-in-law's disabilities, or that Ms. Couch's knowledge was enough to find defendant liable.  Thus, plaintiff has presented sufficient evidence that defendant had knowledge of plaintiff's brother-in-law's disability prior to her termination. *Anderson*, 477 U.S. at 250.

Next, defendant argues that plaintiff cannot establish prong four of the *prima facie* case, that she was terminated under circumstances that raise a reasonable inference that her brother-in-law's disability was a determining factor in the decision [Doc. 32 pp. 25–29].  It asserts that the facts show that defendant terminated plaintiff for her poor work performance, after her "continued performance issues" had been discussed with plaintiff on "numerous" occasions [*Id.* at 25].  Plaintiff simply responds that she has presented "ample evidence" that her association with her brother-in-law was a factor in the decision to terminate her, and that Ms. Stuck's notes "show this by themselves" [Doc. 41 p. 9].

Viewing the evidence in the light most favorable to plaintiff, plaintiff has put forth sufficient evidence to reasonably infer that her brother-in-law's disability was a determining factor in the decision to terminate her.  Ms. Stuck's notes from the day

19

plaintiff was terminated indicate that plaintiff had been "given special consideration" so she could take care of her "indigent relative," and that she refused to "reciprocate flexibility," presumptively because she needed to travel home each lunch break [Docs. 40 p. 11; 40-3 pp. 41–42]. This indicates that plaintiff's relationship with her "indigent" brother-in-law may have been a factor in the decision to fire her.

Ms. Stuck also sought input from Ms. Couch for the termination decision, who, according to plaintiff, was aware of plaintiff's brother-in-law's disabilities and had previously referred to him as "retarded" when explaining to a customer why plaintiff was not available [Doc. 40 p. 11]. Ms. Couch denies making such a statement [Doc. 40-1 p. 27], but plaintiff has identified a customer's deposition testimony regarding this statement, which indicates that this is not a "mere conclusory and unsupported allegation[.]" *See Bell*, 351 F.3d at 253. Moreover, it can be inferred from plaintiff's submissions that Ms. Couch expressed frustration with plaintiff's relationship to her brother-in-law to Ms. Stuck in the termination discussions.

Accordingly, plaintiff has met her burden of establishing a *prima facie* case of discrimination. The burden now shifts to defendant "to articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802–04; *Williams*, 614 F. App'x at 253–54 (citing *Talley*, 542 F.2d at 1105)).

### b.    Legitimate, Non-Discriminatory Reason

As plaintiff has made a *prima facie* showing of discrimination, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for plaintiff's termination.

20

*McDonnell Douglas*, 411 U.S. at 802–04; *Williams*, 614 F. App'x at 253–54 (citing *Talley*, 542 F.2d at 1105)).  Defendant's burden is "one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Defendant submits that plaintiff's poor job performance is a legitimate, nondiscriminatory reason for her termination [Doc. 32 p. 30].  Defendant has produced evidence that plaintiff failed to perform the duties of her job, including that she (1) repeatedly failed to greet customers [*Id.* at 9–10]; (2) failed to follow through on customer requests and even received customer complaints [*Id.* at 10–12]; (3) was inattentive to her job [*Id.* at 12–14]; (4) treated customers and co-workers in an unprofessional manner [*Id.* at 14]; and (5) dressed unprofessionally, in violation of defendant's dress code [*Id.* at 15].  As defendant has presented a legitimate, nondiscriminatory reason for plaintiff's termination, the burden now shifts back to plaintiff to demonstrate that defendant's proffered reason is pretextual.  *Williams*, 614 F. App'x at 256.

### c.      Pretext

Plaintiff may demonstrate that defendant's explanation is not credible by "demonstrating that the proffered reason[] (1) had no basis in fact, (2) did not actually motivate [defendant's] action, or (3) [was] insufficient to motivate [defendant's] action." *Id.* (citing *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010)).  At the summary judgment stage, "a plaintiff need only produce enough

evidence . . . to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012) (citation and internal quotations omitted). In doing so, however, plaintiff "must do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 F. App'x 266, 272–73 (6th Cir. 2006) (citing *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999)).

Plaintiff's burden in demonstrating pretext "merges with [plaintiff's] ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (quoting *Burdine*, 450 U.S. at 256). Plaintiff must demonstrate that defendant's proffered reason "was 'so unreasonable as to be disbelieved.'" *Auble v. Babcock & Wilcox Tech. Servs. Y-12, LLC*, No. 3:13-CV-422-TAV-HBG, 2015 WL 6049825, at *12 (E.D. Tenn. Oct. 15, 2015) (quoting *Sybrandt v. Home Depot*, 560 F.3d 553, 561 (6th Cir. 2009)).

To demonstrate pretext, plaintiff states that defendant's rationale for terminating her has "been in flux" since the morning she was terminated [Doc. 41 p. 9]. Plaintiff notes that, even as far back as February 7, 2013, when plaintiff received a documented verbal and written warning, "the reasons don't [sic] add up" [*Id.*]. As proof, she cites to plaintiff's objections, in which she admits that during the February 2013 meeting, Ms. Stuck and Ms. Couch "expressed their criticism of [p]laintiff's clothes, not greeting customers well enough, and an alleged loan application error" [Doc. 40 p. 31]. Plaintiff

alleges she did not have a chance to read her written warning before signing it, and disputes defendant's contention that she was responsible for the loan application error [*Id.* at 31–32]. Plaintiff also disputes that she was subject to any disciplinary action or counseling in May 2013, and asserts that defendant's progressive discipline policy requires that all final warnings be in writing, which the alleged May 2013 meeting was not [*Id.* at 33]. Plaintiff asserts that the fact defendant did not follow its progressive discipline policy is illustrative of how defendant was "motivated by unlawful animus and distaste for [p]laintiff and her brother-in-law" [Doc. 41 p. 9].

After reviewing plaintiff's assertions, and considering the evidence in the light most favorable to plaintiff, the Court finds that plaintiff creates a genuine dispute as to pretext. Plaintiff has submitted sufficient evidence to create a question of fact as to whether defendant's proffered reason for her termination—her alleged poor work performance—actually motivated defendant's decision to terminate her.

Plaintiff has alleged that both Ms. Couch and Ms. Stuck—the primary individuals involved in defendant's decision to terminate plaintiff—were aware of her brother-in-law's disabilities [Doc. 40 pp. 10–11]. While defendant disputes this assertion, the Court finds that plaintiff has presented sufficient evidence to demonstrate that this is a question of fact best left for the jury. Ms. Stuck's handwritten notes from the date on which plaintiff was terminated, describing plaintiff's "indigent relative" and how she was "given special consideration," also indicate that Ms. Couch and Ms. Stuck discussed plaintiff's brother-in-law on the date of her termination, and that plaintiff's association

23

with him may have been a motivation for their decision to terminate her [*Id.*]. Finally, plaintiff has raised a question of fact as to whether Ms. Couch commented to a customer that plaintiff was "probably taking care of her retarded brother," which could indicate that her association with her brother-in-law was a motivation behind defendant's decision to terminate her [*Id.* at 11, 15]. The Court thus finds that plaintiff has "produce[d] enough evidence . . . to rebut . . . defendant's proffered rationale" for her termination. *Griffin*, 689 F.3d at 592.

As plaintiff has met her burden with respect to the second prong of the *Williams* pretext analysis, the Court does not need to consider whether defendant's reason for terminating plaintiff had no basis in fact or whether it was insufficient to motivate a termination. Having closely reviewed the record, the Court finds plaintiff has presented sufficient evidence to create a genuine dispute as to whether defendant's non-discriminatory reason was pretextual. Accordingly, the Court finds that summary judgment on plaintiff's disability discrimination claim is inappropriate.

### B. Negligent Infliction of Emotional Distress

Plaintiff's complaint also includes a claim against defendant for negligent infliction of emotional distress [Doc. 1 p. 4]. "The elements of a claim for negligent infliction of emotional distress include the elements of a general negligence claim, which are duty, breach of duty, injury or loss, causation in fact, and proximate causation." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012) (footnote omitted). "In

addition, the plaintiff must prove that the defendant's conduct caused a serious or severe emotional injury." *Id.* (footnote omitted).

Defendant argues, with respect to any claim against it for negligent infliction of emotional distress, that plaintiff cannot demonstrate duty, breach, or causation [Doc. 32 p. 34]. Plaintiff does not refute this argument, and in Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, plaintiff "consents to [d]efendant's motion as to her state law claim" of negligent infliction of emotional distress [Doc. 41 p. 1 n.1]. Upon review, the Court agrees with defendant. Thus, the Court will dismiss plaintiff's negligent infliction of emotional distress claim against defendant for this reason.

## IV.    Conclusion

For the reasons stated herein, defendant's Motion for Summary Judgment [Doc. 28] is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's claim against defendant for negligent infliction of emotional distress will be **DISMISSED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE